IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 24, 2010

## STATE OF TENNESSEE v. DAVID DUGGAN

**Direct Appeal from the Criminal Court for Bradley County**
**No. M-08-112      Carroll L. Ross, Judge**

_____

**No. E2010-00128-CCA-R3-CD - Filed October 17, 2011**

_____

A Bradley County jury convicted the Defendant, David Duggan, of facilitation to commit theft of property valued between $1000 and $10,000, facilitation of fraudulent alteration of a manufacturer's identification number, and facilitation of identity theft, and the trial court sentenced the Defendant to an effective sentence of five years in the Tennessee Department of Correction. The Defendant appeals his convictions, claiming that the trial court erred when it: (1) denied the Defendant's motion in limine to exclude the use of the Defendant's prior convictions during trial; (2) denied the Defendant's motion for acquittal; and (3) denied the Defendant a new trial based upon the State's improper closing argument. After a thorough review of the record and applicable law, we affirm the trial court's judgments. Based upon a clerical error on one of the judgments of conviction, as will be discussed below, we remand this case to the trial court to amend the judgment of conviction form to reflect the proper statute section for the Defendant's conviction for facilitation of fraudulent alteration of a manufacturer's identification number.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed
and Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOSEPH M. TIPTION, P.J., and ALAN E. GLENN, J., joined.

Joseph V. Hoffer, Cleveland, Tennessee, for the Appellant, David Duggan.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Steven Bebb, District Attorney General; and Stephen Hatchett, Assistant District Attorney, for the Appellee, State of Tennessee.

## OPINION

# I. Background

This case arises from the theft, alteration, and subsequent sale of a four-wheeler in Bradley County, Tennessee. Based on these events, a Bradley County grand jury indicted the Defendant for conspiracy to commit theft; theft of property valued between $1000 and $10,000; fraudulent alteration of a manufacturer's identification number; and identity theft. At a trial on the Defendant's charges, the following evidence was presented: Piper Cook testified that, on the night of November 20, 2007, her husband, Jesse Cook, was working the night shift, and, because Ms. Cook was nine months pregnant at the time, she arranged to sleep at her mother's house in case she went into labor. Ms. Cook testified that when she left to go to her mother's house, a four-wheeler[1] that she and her husband owned was on the patio where it was normally stored. The next morning, November 21, 2007, both she and her husband returned home, and Mr. Cook went to bed while she began cleaning up around the house. At some point, Ms. Cook went outside and noticed that their four-wheeler was not on the patio, so she asked her husband if he had moved the four-wheeler. He replied that he had not. The Cooks then looked around their property hoping to find the four-wheeler and, when they did not, they contacted police.

Ms. Cook testified that her brother-in-law, Nicholas Cook, who was a co-defendant in this case, was the Defendant's next door neighbor and that the two men were "extremely good friends." Ms. Cook said that she was "sure" the Defendant knew she owned a four-wheeler through his relationship with her brother-in-law. Ms. Cook said that, after she found the four-wheeler missing, she looked on her keychain where the four-wheeler key was attached with a pliant metal wire, and found that the key had been "ripped off the ring." Ms. Cook recalled that the weekend before she found the four-wheeler missing, the family had Thanksgiving dinner at her mother-in-law's home. When she entered her mother-in-law's home she, in keeping with her habit, placed her keys on a hutch where they remained until she was ready to leave.

Ms. Cook testified that she financed the four-wheeler for a total price of $8200.00 in June of 2007. At the time the vehicle was stolen in November 2007, the four-wheeler had 35 miles on it. Ms. Cook continued to make loan and insurance payments on the four-wheeler even after it was taken. At some point, Ms. Cook was contacted by a Bradley County detective, and she learned her four-wheeler had been recovered in Texas. Ms. Cook traveled to Texas to retrieve her four-wheeler, which she discovered had $2900.00 worth of damage. Ms. Cook testified that she had the four-wheeler repaired to the extent she could afford at the time but that she was unable to have the four-wheeler fully repaired.

On cross-examination, Ms. Cook testified that, two weeks before the four-wheeler was

---

[1]In later testimony, the four-wheeler is described as a red Yamaha all-terrain vehicle (ATV).

stolen, she had placed a "For Sale" sign on the four-wheeler and put it in her front yard. Despite not owning the four-wheeler for very long, the Cooks had decided to sell the four-wheeler because they did not use it often and their child was going to be born soon. Ms. Cook testified that several months before the four-wheeler was stolen, she overheard her brother-in-law, Nicholas Cook, asking her husband, Jesse Cook, for money. During this conversation, Nicholas Cook told Jesse Cook that, since the four-wheeler was insured, Nicholas Cook could steal it. Ms. Cook said that, in response, her husband told his brother not to steal the four-wheeler. Ms. Cook agreed that she was aware that Nicholas Cook had stolen items from other family members before but that she did not report this conversation between the two brothers to police after the four-wheeler was stolen.

John Murphy, a Texas Department of Public Safety officer, testified that he recovered Ms. Cook's red Yamaha ATV in Texas in the possession of Jose Sandoval. Sergeant Murphy said that, upon inspection of the four-wheeler, he immediately noticed that the vehicle identification number ("VIN") plate had been altered. He explained that VIN numbers are typically seventeen characters and the one on the red Yamaha ATV was not. Upon closer inspection, the sergeant noticed that a false VIN plate had been attached to the frame of the vehicle with putty or "J.B. Weld" to cover up the actual vehicle identification number. Sergeant Murphy testified that he removed the "J.B. Weld" to reveal the actual vehicle number and was then able to identify the four-wheeler as a "reported stolen vehicle." Sergeant Murphy testified that there were "grind marks" on the four-wheeler indicating someone had tried to smooth the original VIN number that was stamped into the frame by the manufacturer.

Sergeant Murphy questioned Sandoval about the ATV, and, while Sandoval did not have a title for the four-wheeler, he did produce a bill of sale. The bill of sale reflected a portion of the false VIN number that was found on the four-wheeler with an additional six numbers or letters to complete the 17-character VIN required on the bill of sale. Sergeant Murphy testified that Ms. Cook traveled to Texas and claimed her four-wheeler at a property hearing, and the four-wheeler was released to Ms. Cook.

Kevin White, a Bradley County Sheriff's Department detective, testified that Sergeant John Murphy with the Texas Department of Public Safety contacted him on December 27, 2007, to report that he had recovered Ms. Cook's four-wheeler. Sergeant Murphy told Sergeant White that the bill of sale for the vehicle indicated David's Auto Delivery and Recovery as the seller, although the signature on the bill of sale for the seller reflected "Boyd Swafford." Sergeant White said that he researched and found a business license for David's Auto Delivery and Recovery, which identified David Duggan as the owner of this business.

Based upon this information, Sergeant White went to the location listed as the business address listed on the business license, which was also the Defendant's residence. There, he spoke with the Defendant about the four-wheeler. The Defendant told Sergeant

White that he had purchased the four-wheeler at a flea market in Dalton, Georgia, on November 24, 2007, from a woman named Lena Smith. The Defendant described Lena Smith as a, "[w]hite female in her 30's, average height, average build, with dark hair." The Defendant provided Sergeant White with a bill of sale indicating the purchase of a four-wheeler from Lena Smith for $4600 with a signature bearing the name Lena Smith and a social security number at the bottom of the document.

During this first meeting with the Defendant, Sergeant White asked if he could look around the property, and the Defendant consented. While searching the "open garage, carport area," Sergeant White observed a grinder and a container of "J.B. Weld" lying on the ground.

Sergeant White testified that he later checked the social security number identified on the bill of sale as Lena Smith's social security number. Based upon this research, Sergeant White learned that Lena Smith was approximately seventy years old and not in her thirties as the Defendant had described. Upon learning that the Defendant had falsified the information provided about Lena Smith, Sergeant White began developing the Defendant as a suspect in this case.

Sergeant White testified that the Defendant gave five varying statements during the course of the investigation about the sale of the four-wheeler. The Defendant's first statement was that he purchased the four-wheeler on November 24, 2007, from Lena Smith at a flea market in Dalton, Georgia. Boyd Swafford was the only other person present during this exchange. The Defendant's second statement was similar to his first except that the Defendant said Nicholas Cook was also present at the flea market sale. In the Defendant's third statement, he stated that a notary public was summoned to the flea market to witness the purchase and that both the owner of the flea market and one other individual also witnessed the purchase.

When Sergeant White pointed out the discrepancies between the statements to the Defendant, the Defendant provided a fourth statement to the detective in which he admitted that he lied about purchasing the four-wheeler from Lena Smith. He told the detective that the story was "totally false" and the bill of sale was a "fake" "to cover their tracks." The Defendant then said that, in early November, he went with Nicholas Cook to a residence in the McDonald area. The Defendant said that Nicholas Cook had a key to a four-wheeler, they loaded it on to Nicholas Cook's truck, and took it to the Defendant's residence. The Defendant said that he kept the four-wheeler at his residence for a few weeks. The Defendant denied altering the VIN number and claimed that the VIN number on the vehicle was the same VIN number as when he later sold the four-wheeler.

In the Defendant's fifth and final statement to the sergeant he said that, after having the four-wheeler for several weeks, Nicholas Cook told the Defendant that Jesse and Piper

Cook had reported the four-wheeler stolen and that Cook needed to "get rid of it." The Defendant said he allowed Nicholas Cook to use his grinder and "J.B. Weld" to change the VIN number and put a fake VIN number on top of the original VIN number. The Defendant sold the four-wheeler to Jose Sandoval.

Sergeant White testified that the Defendant told him that he had been stopped by a patrol officer while on the four-wheeler near his home. Sergeant White was unable to locate a police report confirming the Defendant's statement.

On cross-examination, Sergeant White testified that Nicholas Cook's wife, Emily Cook, contacted him and said that she had left, and was divorcing, her husband because of "some things" he had told her. She told the sergeant that Nicholas Cook admitted his involvement in the theft of the Cooks's four-wheeler. Emily Cook said that Nicholas Cook told her that his brother, Jesse Cook, had contacted him in November and told Nicholas Cook that he could not afford the four-wheeler payments or insurance payments for the four-wheeler. According to Nicholas Cook, his brother asked him to "get rid of it" so that Jesse Cook could file an insurance claim. Sergeant White agreed that this information raised an allegation of insurance fraud but that his investigation revealed no evidence of insurance fraud. Sergeant White agreed that Boyd Swafford also indicated that Jesse Cook may have been involved in the theft, but the sergeant maintained that the evidence did not support this allegation.

Sergeant White testified that Emily Cook also told him that Nicholas Cook said that he contacted the Defendant and asked him to help steal the four-wheeler after speaking with Jesse Cook. In later testimony, the sergeant said Emily Cook also told him that Nicholas Cook said they had sold the four-wheeler at a flea market in Dalton, Georgia, and then made up a story about buying the four-wheeler at the flea market. Emily Cook said that Nicholas Cook told her that the Defendant found a social security card belonging to Lena Smith in a vehicle the Defendant had towed as part of his employment.

Sergeant White testified that he also interviewed Boyd Swafford, who initially told him that he was with the Defendant when the Defendant purchased the four-wheeler from Lena Smith. After the Defendant confessed, Swafford explained his previous false statement by saying that the Defendant asked him to tell detectives that Swafford was present for the purchase but that this story was a "cover up" lie.

At the close of the State's proof, the Defendant made a motion for a judgment of acquittal, which the trial court denied. The Defendant then offered the following proof: William Lemarr testified that he had known the Defendant for five years and described him as a "friend[]." Lemarr recalled that, in September 2007, while Lemarr was living with Nicholas Cook, he saw Nicholas Cook spray painting the frame of a four-wheeler in black, as it sat in the back of Nicholas Cook's truck. Lemarr testified that the Defendant bought this

four-wheeler from Nicholas Cook, and he estimated that the Defendant had the four-wheeler for several months.

Lemarr then recounted a conversation he had with Nicholas Cook several months before he first saw the four-wheeler in Nicholas Cook's possession. Nicholas Cook told Lemarr that "there was an insurance thing that involved his brother, and [Nicholas Cook] was going to be making some money." Lemarr told Nicholas Cook it was not a good idea, but then he forgot about the conversation assuming that Nicholas Cook was "just trying to be cool."

Robin Blackwell, the Defendant's neighbor, testified that, in August or September of 2007, the Defendant brought a red four-wheeler to her home to see if she and her husband were interested in purchasing it.

Lawrence Williams, the Defendant's neighbor, testified that he saw the Defendant on a red four-wheeler in September 2008, which contradicted other witness testimony that the Defendant had a four-wheeler in September 2007, and that the Defendant told Williams that the Defendant had purchased the four-wheeler at a flea market.

The Defendant testified that through his business, he bought cars, towed wrecked cars, removed abandoned vehicles from the interstate, and repossessed cars for various bondsmen and title pawn businesses. The Defendant said that Nicholas Cook lived next door to him and approached the Defendant one day asking if he might be interested in purchasing his brother Jesse Cook's four-wheeler. The Defendant told Nicholas Cook he did not have the money at that time but may have it soon as part of a settlement he anticipated receiving in the near future. The Defendant was unclear of when this conversation occurred, but he estimated the conversation took place "sometime before" July, because he received the settlement money in July. The Defendant said that, the first or second week of September, he paid Nicholas Cook $3000 for the four-wheeler. After he gave Nicholas Cook the money for the four-wheeler, he went with him to a house "in the McDonald area." The Defendant recalled that Nicholas Cook went around behind the house and returned pushing a four-wheeler. Nicholas Cook removed the key from the four-wheeler and loaded it into the back of Nicholas Cook's pick up truck.

The Defendant said he did not receive any paperwork from the sale until the second week of November when the Defendant, accompanied by Boyd Swafford, confronted Nicholas Cook about the paperwork at the flea market. Nicholas Cook told the Defendant to wait until "she" got back. Soon, a woman approached the men, identified herself as the owner of the four-wheeler, and signed the bill of sale, "Lena Smith." The Defendant described this woman as "in her 30's," dark hair, slender." The Defendant asked his friend "Wayne" to verify that she signed the document, and "Wayne" did so.

The Defendant said that he later learned from Nicholas Cook that Jesse and Piper Cook had reported the four-wheeler stolen to their insurance company. The Defendant said that he was "kind of surprised, . . . and kind of upset at the same time." The Defendant told Nicholas Cook that he needed to "fix this" and "to talk with his brother," because the Defendant had too much money invested in the four-wheeler to lose it. The Defendant said that Nicholas Cook told him that he would "fix it." The following day, Nicholas Cook asked the Defendant if he could borrow a grinder "and some other stuff" and the Defendant agreed. The Defendant explained that he did not accompany Nicholas Cook to his garage, so he was unaware of exactly which tools Nicholas Cook borrowed.

The Defendant said that, because the four-wheeler was "extremely loud," he got in trouble with the police and ultimately his wife demanded he sell the four-wheeler. He took the four-wheeler to the flea market on December 8 and sold the four-wheeler to Jose Sandoval. The Defendant testified that he, his friend, "Wayne," and Jose Sandoval went to a notary public in Dalton and completed the paperwork for the sale of the four-wheeler.

The Defendant denied ever intentionally trying to mislead Detective White and explained that he was "uncomfortable" and felt "pressured" when speaking to Detective White. The Defendant denied having an agreement to commit a crime with Nicholas Cook, denied stealing Jesse and Piper Cook's four-wheeler, and denied changing the serial numbers on the four-wheeler. The Defendant acknowledged that he had previous convictions for bank robbery, forgery, burglary, and assault with a deadly weapon.

On cross-examination, the Defendant confirmed that he bought the four-wheeler and then received the bill of sale later at a flea market from a woman, Lena Smith, who was introduced to him by Nicholas Cook. The Defendant denied any knowledge that the VIN number on the four-wheeler was changed, maintaining that he only told Nicholas Cook to "fix the problem." The State then played the following portion of an audio-recording of the Defendant's interview with Detective White:

Detective White:  You tell me how it is you came to be involved [with] this four-wheeler.

Defendant:  (Indiscernible) To a flea market. I don't really recall the exact date or anything. I went down there, me and my buddy went down, and I had got a settlement check, 13,000 or so and had a little extra money. Like I told you before, I kind of fiddle around with stuff, swapping and trading, trying to make an extra dollar. Well, I went down there I was over, way on the back side of the flea market looking at motors and whatnot, and my buddy called me on the little walkie-talkie, buddy

walkie-talkie thing we've got, told me to come look at the four-wheeler. I went up there made my way over there to look at it. It was nice, '07. I thought it was a '06, but he told, Wayne told me it was a '07, but anyway, it had like 61 miles or so, 51 miles, something like that on it. The lady wanted $5,000.00 cash for it. Well, I had, you know, a pretty good bit of money on me. So we got the notary public to come - - I asked her first if, you know, she had a title and all that. "No, the title don't come until a few weeks later." That's what she told me. I wasn't aware of that, but that's what she told me. So we called the notary public down, so that they could do a check on it, and they called Whitfield County law and they said it wasn't stolen. So I had a wrecker form that I've got (indiscernible) still current on, but I don't pull nothing. It's the only way I can keep up with what's going on with what all I've been into, try to keep it both ways. I think, "Well," - - he - - the notary public lady came down, charged us 15 bucks. She called the police for us, Whitfield County law, said it wasn't stolen. I paid her for the four-wheeler. I went home. I kept it about, maybe five weeks, right at five weeks. While I had it at the house, I was all over my hillside with it. The neighbors called in on me, had the law come out there and run me out of the road, which was kind of stupid.

The Defendant explained the absence of any mention during this interview of Nicholas Cook's presence during the transaction by saying that "Nobody asked me about him." The State then played another excerpt from the audio-recording of the Defendant's statement to police, wherein the Defendant told Detective White that he did not see Nicholas Cook at the flea market. The Defendant explained his statement to the detective saying, "I meant [Nicholas Cook] didn't stay right there in the area. After [Nicholas Cook] introduced me to [Lena Smith], he went back to his table where he was selling their items. . . . He wasn't standing there the whole time."

After the State played another excerpt from the audio-recordings wherein the Defendant said that he did not go to Jesse Cook's house and "get no four-wheeler," the Defendant explained that what he really meant was that he did not go to Jesse Cook's house "to steal" the four-wheeler.

The Defendant maintained that Nicholas Cook never told the Defendant he was going

to change the VIN plate on the four-wheeler. The Defendant said that he did not learn until "way later" that the VIN number was changed. The Defendant said that he told Nicholas Cook to "fix it" but by saying this, he meant for Nicholas Cook to go and speak with his brother and sister-in-law about their filing a stolen vehicle report. The Defendant denied that Nicholas Cook altered the VIN number in the Defendant's garage. The State then played the following excerpt from the audio recording of the Defendant's statement to police:

Detective White: So [Nicholas Cook] used your stuff to change the numbers?

Defendant: Yeah, I mean, I was there, but I didn't do it, you know.

On the audio-recording, the Defendant then admitted that Nicholas Cook altered the VIN number at the Defendant's house. The Defendant agreed that on the recording he says he was present while the VIN number was altered, but said that he didn't "remember being there." The Defendant testified that he bought the four-wheeler which he later learned was stolen, and then he resold the four-wheeler, agreeing that he did so knowing that the four-wheeler was stolen and the VIN number altered.

During further cross-examination, the Defendant and the prosecutor had the following exchange as to the Defendant's previous convictions:

State: Okay. Just so we're clear, Mr. Duggan, [your attorney] asked you about it, but you have been convicted of forgery, right?

Defendant: Yes.

State: You've been convicted of first degree burglary, right?

Defendant: I guess, yeah, if it's on there.

State: Third degree burglary back in the '80's, right?

Defendant: I don't know what those are now. I don't know which ones, what kind of degree they are, I guess.

State: Okay, okay. Theft of credit cards?

Defendant: Yes, I pled guilty to that because it was one of the charge on that indictment, and I pled guilty to all of them because they were running them together.

| State: | And then you said bank robbery, conspiracy to commit bank robbery, and assault with a deadly weapon. |
| --- | --- |
| Defendant: | Yeah. Well, whenever you've got a weapon with you and rob a bank, that's - - you automatically get that charge. |
| State: | And you were charged with conspiracy and convicted of conspiracy. |
| Defendant: | Yeah, I pled guilty to it, yes. |

The State called Tina Cato, Piper Cook's mother, as a rebuttal witness. Ms. Cato testified that, in September 2007, her daughter and Jesse Cook were living with Ms. Cato and kept their four-wheeler parked in Ms. Cato's garage. Ms. Cato said that from September 2007 until the time the four-wheeler was reported stolen, Ms. Cato saw the four-wheeler "just about every day."

Based upon this evidence, the jury convicted the Defendant of facilitation to commit theft of property, facilitation of fraudulent alteration of a manufacturer's identification number, and facilitation of identity theft. The trial court sentenced the Defendant to an effective sentence of five years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims that the trial court erred when it: (1) denied his motion in limine to exclude use of his prior convictions during trial; (2) denied his motion for acquittal; and (3) denied him a new trial based upon the State's improper closing argument.

### A. Admission of Defendant's Prior Convictions

The Defendant asserts that the trial court erred when it denied his motion in limine to exclude his previous convictions. He argues that, pursuant to Rule 609 of the Tennessee Rules of Evidence, the convictions were inadmissible because they were more than ten years old and "overly prejudicial." The State concedes that the trial court failed to properly analyze the Defendant's criminal history for purposes of impeachment but argues that, in light of the evidence presented at trial, the error is harmless.

Pursuant to Tennessee Rule of Evidence 609, the credibility of the defendant may be attacked by presenting evidence of prior convictions if certain conditions are met. First, the State must give reasonable pretrial notice of the impeaching convictions. Tenn. R. Evid.

609(a)(3). Second, the convictions must be punishable by death or imprisonment over one year or must involve a crime of dishonesty or a false statement. Tenn. R. Evid. 609(a)(2). Third, generally there must be ten years or less between the date of the defendant's release from confinement on the prior conviction and the commencement of the instant prosecution. Tenn. R. Evid. 609(b). Finally, the impeaching conviction's probative value on credibility must outweigh its unfair prejudice. Tenn. R. Evid. 609(a)(3).

In determining whether the probative value of a prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues, a trial court should consider the similarity between the crime in question and the underlying impeaching conviction, as well as the relevance of the impeaching conviction with respect to credibility. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). The fact that a prior conviction involves the same or similar crime for which the defendant is being tried does not automatically require its exclusion. *State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997); *State v. Miller*, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). However, if "the prior conviction and instant offense are similar in nature the possible prejudicial effect increases greatly and should be more carefully scrutinized." *Long v. State*, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980). A trial court should first analyze whether the impeaching conviction is relevant to the issue of credibility. *Waller*, 118 S.W.3d at 371. Rule 609 of the Tennessee Rules of Evidence suggests that the commission of any felony is "generally probative" of a criminal defendant's credibility. *Id.* The Tennessee Supreme Court, however, has rejected a per se rule that permits impeachment by any and all felony convictions. *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). A prior felony conviction still must be analyzed to determine whether it is sufficiently probative of credibility to outweigh any unfair prejudicial effect it may have on the substantive issues of the case. *Waller*, 118 S.W.3d at 371. To determine how probative a felony conviction is to the issue of credibility, the trial court must assess whether the felony offense involves dishonesty or a false statement. *Id.* A trial court's decision under this rule will not be overturned absent an abuse of discretion. *Mixon*, 983 S.W.2d at 675.

In this case, the State filed a Notice of Intent to Seek Enhanced Punishment and/or Notice of Impeaching Convictions, which included nine of the Defendant's prior convictions. The earliest conviction date listed on the State's notice is November 5, 1980, and the most recent conviction date is July 19, 1990. The Defendant responded in a motion in limine that the convictions were not admissible to impeach his credibility because more than ten years had elapsed between the date of release for the convictions and the commencement of the current action. At the hearing on the motion, the State suggested that the trial court take the motion under advisement until the proof in the case was presented. The trial court agreed and preliminarily stated the following about the Defendant's motion:

> I'll hear the proof before I actually make that final decision, but I want [ ] the
> defense to know that I'm inclined to let some of these in, because of the

nature of the kind of - - a bank robbery, assault with deadly weapons, burglaries. I think there's a long and extensive pattern here of fairly significant crimes of dishonesty that go to credibility. . . . I will follow the State's advice and . . . hear the proof before I actually make that final decision, but I want . . . you to know up front I'm inclined to let a significant portion of these in, because I think . . . [the convictions are] very probative. And . . . they go to credibility and . . . so I'm prone to let them in, but you know, I'll reserve final judgment of that.

On the day the Defendant's trial was to begin, defense counsel again raised the issue of the motion in limine requesting that, if the trial court decided to allow the State to use the prior convictions for purposes of impeachment, it limit the number of prior convictions allowed. The trial court responded to this request by saying:

Well, the issue is whether they're admissible. . . . My issue is whether it is admissible. *If it is*, . . . I'm going to let the State put them on. . . .[Y]es, [the convictions are] prejudicial, but I think it's very probative of a man that sits here today and says he's innocent, he wouldn't do such a thing, and he's got a long history of similar action, including a bank robbery in federal court. I mean, *if* they're admissible, they're admissible, and I'm not going to restrict the State from putting them on.

(emphasis added).

We find no other reference to the Defendant's motion in limine in the record until the Defendant's motion for a new trial. Absent from the record is the trial court's final ruling on the motion in limine, if it in fact ever made one. During the trial, without a ruling from the trial court, defense counsel asked the Defendant about his criminal history, and the Defendant responded by naming previous convictions for bank robbery, assault with a deadly weapon during the commission of a bank robbery, conspiracy, forgery, and burglary. On cross-examination, the State confirmed with the Defendant previous convictions for forgery, first degree burglary, third degree burglary, theft of credit cards, bank robbery, conspiracy to commit bank robbery and assault with a deadly weapon.

We note that during the State's cross-examination of the Defendant, defense counsel made no contemporaneous objection to the prosecutor's questions confirming the Defendant's previous convictions. In most cases, the failure to raise a contemporaneous objection to the admission of evidence at the time the evidence is introduced at trial results in waiver of the particular issue on appeal. *See* Tenn. R. App. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, an objection is considered contemporaneous if counsel makes the objection in a motion in limine and the particular issue is considered and ruled upon. *State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App.

2001). In such cases, counsel is not required to make repetitious objections to issues which have been previously ruled upon in order for that issue to be preserved on appeal. *Id.* Nonetheless, counsel must be vigilant to object contemporaneously to issues which are only tentatively suggested or incompletely developed in connection with a motion in limine, otherwise, counsel risks waiver of the issue on appeal. *Id.*; *see also State v. McGhee*, 746 S.W.2d 460, 462 (Tenn. 1988).

The record reflects that, although the Defendant raised this issue in a motion in limine, the trial court had not clearly and definitively ruled on the motion in limine, and the Defendant did not make a contemporaneous objection to the cross-examination of the Defendant concerning his prior convictions. Moreover, it was defense counsel who first introduced the Defendant's prior convictions on direct examination. Appellate relief is not required when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Thus, we conclude that the Defendant's failure to either request that the trial court rule on the motion in limine or contemporaneously object to the State's questioning as to the convictions constitutes waiver of this issue.

### B. Denial of Motion for Judgment of Acquittal

Next, the Defendant claims that the trial court erred when it denied his motion for a judgment of acquittal because the evidence was insufficient to support his convictions. The State responds that the trial court properly denied the Defendant's motion for judgment of acquittal.

Rule 29 of the Tennessee Rules of Criminal Procedure provides, in relevant part, as follows:

> On Defendant's motion or its own initiative, the court shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, presentment, or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses.

Tenn. R. Crim. P. 29(b). This rule empowers the trial judge to direct a judgment of acquittal when the evidence is insufficient to warrant a conviction either at the time the State rests or at the conclusion of all the evidence. *See, generally, Overturf v. State*, 571 S.W.2d 837 (Tenn. 1978). By presenting evidence, however, a defendant generally waives his ability to appeal a trial court's denial of his motion for a judgment of acquittal. *Finch v. State*, 226 S.W.3d 307, 317 (Tenn. 2007).

In this case, the trial court denied the Defendant's motion for judgment of acquittal raised at the close of the State's proof. Following this denial, the Defendant presented

evidence. The Defendant, therefore, waived his right to appeal the denial of his motion for judgment of acquittal raised at the close of the State's proof. *Id*. at 317. At the close of the Defendant's proof, however, the Defendant made another motion for judgment of acquittal, which the trial court also denied. Thus, it is the second motion denied that we now review, and in doing so, we will address all evidence, not just that brought during the State's case-in-chief. *See State v. Erik Guerrero*, No. M2010–00851–CCA–R3–CD, 2011 WL 3107722, at *17 (Tenn. Crim. App., at Nashville, July 25, 2011), *Tenn. R. App. P. 11 filed on September 23, 2011*.

The standard by which the trial court determines a motion for judgment of acquittal is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction. *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *State v. Anderson*, 880 S.W.2d 720, 726 (Tenn. Crim. App. 1994). A motion for a judgment of acquittal is a question of law and, thus, the trial court reviews only the legal sufficiency of the evidence and not the weight of the evidence. *State v. Adams*, 916 S.W.2d 471, 473 (Tenn. Crim. App. 1995); *State v. Campbell*, 904 S.W.2d 608, 611 (Tenn. Crim. App. 1995). To determine whether the evidence is insufficient to sustain the conviction, the trial court must consider "the evidence introduced by both parties, disregard any evidence introduced by the accused that conflicts with the evidence adduced by the State, and afford the State the strongest legitimate view of the evidence, including all reasonable inferences which may be drawn from the evidence." *Id*. (citing *State v. Hall*, 656 S.W.2d 60, 61 (Tenn. Crim. App. 1983)).

## 1. Facilitation of Theft of Property

The Defendant was convicted of facilitation of theft of property of a value over $1000, but less than $10,000. "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2006). Tennessee Code Annotated, section 39-11-403(a) provides the following:

> A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

The evidence considered in the light most favorable to the State proves that the Defendant and Nicholas Cook went to the victims' house and took their four-wheeler, valued at $8200.00, without the Cooks' consent. The Defendant then kept the four-wheeler at his home for several weeks and, upon learning that the victims had reported the four-wheeler stolen, the Defendant sold the four-wheeler at a flea market in Dalton, Georgia, to "get rid of it." This evidence shows that the Defendant provided Nicholas Cook substantial

assistance in obtaining and keeping the four-wheeler without the owners' consent and also in disposing of the stolen four-wheeler after authorities had been notified of the theft. This sufficiently proves the Defendant had an intent to deprive the owners of the four-wheeler.

The Defendant complains that because Jesse Cook never testified at trial and there was testimony at trial referencing insurance fraud, the trial court should have granted the Defendant's motion for acquittal as to this conviction. The weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. *See Bland*, 958 S.W.2d at 659; *Bolin*, 405 S.W.2d at 771. The testimony of Piper Cook, if deemed credible by the jury, negated the defense theory that Jesse Cook was involved in the theft of the four-wheeler. By its verdict, the jury exercised its prerogative and chose to credit the testimony of the State's witnesses.

Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of facilitation of theft of property over the value of $1000, but less than $10,000. The Defendant is not entitled to relief on this issue.

**2. Facilitation of the Fraudulent Alteration of a Vehicle Identification Number**

The Defendant's conviction for facilitation of the fraudulent alteration of a manufacturer's identification number requires the State to prove that the Defendant knowingly and with the intent to conceal or misrepresent the identity of an item:

> deface, destroy or alter the manufacturer's serial, engine or transmission number or other distinguishing number or identification mark of a motor vehicle or its component parts, nor shall any person place or stamp any serial, engine, transmission or other number or mark upon a motor vehicle or its component parts, except one assigned by the department.

T.C.A. § 55-5-112(a) (2006).

As previously discussed, Tennessee Code Annotated, section 39-11-403(a) provides the following definition for facilitation:

> A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

The evidence considered in the light most favorable to the State proves that the Defendant, while in possession of the victims' four-wheeler and after learning the victims

had reported the four-wheeler stolen, loaned tools to Nicholas Cook to alter the four-wheeler's VIN number. The Defendant told police at one point that he was present when Nicholas Cook altered the VIN number with the Defendant's tools while the four-wheeler was on the Defendant's property. Thereafter, the Defendant sold the four-wheeler to Jose Sandoval to "get rid of it." This evidence supports the jury's finding that the Defendant knew Nicholas Cook was going to alter the four-wheeler's VIN number and that he furnished substantial assistance by providing tools for the commission of this felony.

Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of facilitation of the alteration of a manufacturer's identification number. As such, the Defendant is not entitled to relief on this issue.

Upon our review of the record, we find that the Defendant was charged under the statute section 55-5-112, which provides that the alteration of a motor vehicle is a Class E felony. The judgment form, however, reflects incorrectly statute section 39-14-134 which provides for a Class A misdemeanor for altering an item's permanent distinguishing numbers. Accordingly, we remand this case to the trial court to amend the judgment of conviction form to reflect the proper statute section for the Defendant's conviction.

### 3. Facilitation of Identity Theft

The Defendant argues that there was insufficient evidence to prove that Lena Smith was "a real person, whose identity had been stolen." Because Lena Smith did not testify at trial, the Defendant asserts that his testimony is uncontroverted that Lena Smith was present and consented to the use of the social security card when he received the bill of sale. The State responds that the evidence presented at trial sufficiently supports the Defendant's conviction for facilitation of identity theft.

The identity theft statute provides:

> A person commits the offense of identity theft who knowingly obtains, possesses, buys or uses, the personal identifying information of another:
>
> (1) With the intent to commit any unlawful act including, but not limited to, obtaining or attempting to obtain credit, goods, services or medical information in the name of such other person; and
>
> (2) (A) Without the consent of such other person; or
>     (B) Without the lawful authority to obtain, possess, buy or use that identifying information.

T.C.A. § 39-14-150(b).

The evidence considered in the light most favorable to the State proves that the Defendant initially provided police with a bill of sale that reflected the signature of Lena Smith as the seller of the four-wheeler and her social security number. The Defendant described Lena Smith as a "[w]hite female in her 30's, average height, average build, with dark hair." Upon further investigation, police found that the Defendant had provided false information and that the Lena Smith associated with the social security card did not match the Defendant's description. When confronted with this information, the Defendant admitted this story was false and designed to "cover their tracks." Emily Cook, the co-defendant's wife, told police that the Defendant found the social security card in a vehicle he had towed. This evidence supports the jury's finding that the Defendant furnished substantial assistance by providing a social security card he was not authorized to use to create a false bill of sale for the four-wheeler "to cover their tracks."

Accordingly, we conclude that the evidence is sufficient to support the jury's finding that the Defendant was guilty beyond a reasonable doubt of facilitation of identity theft. The Defendant is not entitled to relief on this issue.

## C. Improper Closing Argument

The Defendant contends that the Assistant District Attorney committed prosecutorial misconduct based upon improper statements made in closing argument. The State responds that the State's argument was not improper, and even if improper, it did not affect the verdicts. The trial court, in denying the Defendant's motion for new trial on the basis of improper argument, said, " I do not find that comments by the State during closing rose to any kind of [ ] improper behavior that would warrant a new trial or reversal on this."

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). This Court has explained that "closing arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

When an appellate court determines an argument to be improper, "the established test for determining whether there is reversible error is whether the conduct was so improper or

the argument so inflammatory that it affected the verdict to the Appellant's detriment." *Goltz*, 111 S.W.3d at 5 (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). In measuring the prejudicial impact of an improper argument, this Court should consider the following factors: "(1) the facts and circumstances of the case; (2) any curative measures undertaken by the court and the prosecutor; (3) the intent of the prosecution; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case." *Goltz*, 111 S.W.3d at 5-6 (citing *Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)); *see State v. Buck*, 670 S.W.2d 600, 609 (Tenn. 1984).

In *Goltz*, this Court found that within the closing argument, five general areas of prosecutorial misconduct are recognized:

> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his [or her] personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant. *See State v. Thornton,* 10 S.W.3d 229, 235 (Tenn. Crim. App. 1999); *Lackey v. State,* 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978); TENN. CODE OF PROF'L RESPONSIBILITY DR 7-106(c)(4).
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. *See [State v.] Cauthern,* 967 S.W.2d [726,] 737 (1998); *State v. Stephenson,* 878 S.W.2d 530, 541 (Tenn. 1994).
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. *See Cauthern,* 967 S.W.2d at 737; *State v. Keen,* 926 S.W.2d 727, 736 (Tenn. 1994).
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Goltz,* 111 S.W.3d at 6 (quoting STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).

We first note that the Defendant makes five separate challenges to different aspects of the State's closing arguments, and yet only once objected during closing argument.

Typically when a prosecutor's statement is not the subject of a contemporaneous objection, the issue is waived. Tenn. R. Crim. P. 33 and 36(a); *State v. Thompson*, 10 S.W.3d 299, 234 (Tenn. Crim. App. 1999); *State v. Green*, 947 S.W.2d 186, 188 (Tenn. Crim. App. 1997); *State v. Little*, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992). In the interest of justice, however, we elect to review all five of the Defendant's claims.

### 1. Consideration of Prior Convictions - "Bad Things"

The Defendant asserts that the State improperly argued "how the jurors should consider the [D]efendant's prior convictions in light of Evidence rule 609(a)(3)." Specifically he cites the following passage from closing arguments:

> The only people in this case that [ ] you have not heard a single bad thing about - - you've heard bad stuff about [the Defendant]. You've heard bad stuff about Nicholas Cook. You've heard bad things about his wife Emily Cook. You've heard bad things about Boyd Swafford. You have not heard a single bad thing about Piper Cook or her mom."

Based upon this passage, the Defendant argues that the State is ignoring "the point and purpose" of Tennessee Rule of Evidence 609 that prior convictions are used to impeach credibility and not to prove "bad things."

Our review of the record reveals that, during closing argument, the State addressed the inconsistencies in testimony and pointed out statements that were "not reconcilable." The State asserted that this was a case that came down to the credibility of the witnesses. In so doing, the State pointed out evidence indicating which witnesses had a history of dishonest conduct, referencing this with the term, "bad things." Although we think it wise for the State to more carefully select the words used to describe convictions admitted for the purposes of impeachment, the prosecutor's argument, when viewed within the context of the entire argument and the evidence, was one based upon asking the jury to assess the credibility of certain witnesses. Thus, we conclude that the trial court did not err when it denied the Defendant's motion for a new trial on this basis. The Defendant is not entitled to relief as to this issue.

### 2. Personal Opinion and Beliefs

The Defendant identifies two instances during closing argument of alleged improper argument based upon the State's assertions of "personal opinion and beliefs regarding the evidence in this case." The prosecutor, after addressing inconsistencies within the Defendant's own testimony at trial, described the cross-examination saying, "I felt like - have you ever tried to pick up a bar of soap when it's wet? You just can't get your hands on it? That's what I felt like talking to [the Defendant] up here." The Defendant objected to this

argument and the trial court overruled the objection.

In the other instance, the Defendant relies upon the following portion of closing argument:

> Folks, I used to, I used to love these kind of cases, but after awhile, they, they get old. But the, but the simple part of these cases - and this is why I asked in voir dire if people could judge credibility, because that's what it comes down to. That's what it comes down to. Can you all tell who's lying here? And I think you can. I think you can.

As to the prosecutor's comparison between the inconsistencies in the Defendant's testimony during the trial and slippery soap, we do not conclude that the trial court erred in denying the Defendant a new trial on this basis. The statement is temperate, based upon the evidence introduced at trial, relevant to the issue of credibility, and not otherwise improper. Likewise, it was not error for the trial court to deny the Defendant's motion for new trial based upon the prosecutor's expression of weariness in dealing with credibility issues in a case. Thus, the Defendant is not entitled to relief as to this issue.

### 3. Appeal to the Jury's Passion and Prejudice

The Defendant asserts that the State improperly commented on the cross-examination of Piper Cook. Specifically, the Defendant relies upon the following two statements made during closing:

> These people report their four-wheeler stolen and they're treated like criminals. . . . Did you hear that [Piper Cook] has a criminal history, that her husband has a criminal history? But [the victims] are being treated like criminals.

> I submit to you that I do not believe we've reached the point in Bradley County where a victim can do everything right, report it, turn it into [sic] the insurance, come to court, testify, and be treated like this. I don't believe it. I do not believe it.

The Defendant further contends that the State "expressed personal opinion regarding defense tactics and cross-examination."

In the present case, the defense strategy was to create reasonable doubt by pursuing a line of questioning that would reveal insurance fraud on the part of the victims. By raising such a defense and asserting it in closing argument, it was not then improper for the State to respond to allegations that the victims in this case created this entire incident as a ruse to

collect insurance on the four-wheeler. Further, the jury was present during the testimony of all witnesses and was charged with the duty of determining issues of credibility. We conclude no error exists in the trial court's denial of the Defendant's motion for new trial based upon this issue. The Defendant is not entitled to relief as to this issue.

### 4. Shifting the Burden

The Defendant's final complaint as to the State's closing argument is that the prosecutor shifted the burden of proof to the Defendant rather than the State. He claims the prosecutor did so by telling the jurors that the only way it could acquit the Defendant would be to believe "every word that came out of his mouth." The State responds that the prosecutor did not suggest the Defendant bore any burden of proof at trial but was simply pointing out that there were irreconcilable conflicts in the evidence. The comment at issue is as follows:

> Is there proof of theft? This is what this case comes down to. Is there proof of theft? Because, folks, to acquit that man sitting over there, to walk in here and find him not guilty, you're going to have to believe every word that came out of his mouth, every word that came out of his mouth. And that's going to be hard for you to do, because you heard all kinds of statements.

We agree with the State that the prosecutor's statements did not shift the burden of proof, but merely recognized the untenable conflicts in the evidence that the jury had to resolve. The Defendant claimed he acquired possession of the four-wheeler in September 2007, while Piper Cook and her mother testified that the four-wheeler disappeared some time during the night of November 20 or the early morning of November 21, 2007. The Defendant claimed Lena Smith was a woman in her thirties, but Sergeant White confirmed that the Lena Smith associated with the social security number on the bill of sale was a woman in her seventies. The Defendant claimed that Lena Smith provided her social security card number at the time of the sales transaction for the four-wheeler while Emily Cook told police that the Defendant obtained Lena Smith's social security card from a vehicle he towed. Moreover, the Defendant's statements to police and later trial testimony contained numerous inconsistencies. The State's argument pointing out these inconsistencies did not improperly shift the burden of proof to the Defendant. Thus, the trial court did not err in denying the Defendant's motion on this basis. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based upon the foregoing and the record as a whole, we affirm the judgments of the trial court but remand this case for the trial court to correct the judgment form for theft of property consistent with this opinion.

_____

ROBERT W. WEDEMEYER, JUDGE